[Cite as *State v. Wooten*, 2014-Ohio-3980.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

STATE OF OHIO

    Appellee

    v.

ALLEN F. WOOTEN

    Appellant

C.A. No.      13CA010510

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     13CR087517

DECISION AND JOURNAL ENTRY

Dated: September 15, 2014

---

WHITMORE, Judge.

{¶1} Defendant, Allen Wooten, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I

{¶2} From January 2011 to September 2011, Ashley Wilson lived in a Fulton Homes apartment in Lorain, Ohio. Wilson lived there with her five children, whose ages ranged from 13 years old to a couple of months old. R.E., who is Wilson's second oldest, would often watch the younger children while Wilson took her oldest child to school. Wilson would typically be gone between 15 and 30 minutes.

{¶3} On November 29, 2012, just over a year after moving, R.E. told her mother that she had been raped while they lived in Fulton Homes. R.E. told her mother that Wooten, a maintenance man at the apartment complex, had raped her one day when Wilson had taken the oldest child to school. According to R.E., Wooten had come to repair something upstairs after

Wilson had left.  R.E. let him in and went to her bedroom with two of her younger siblings.  R.E. testified that Wooten then entered her room, told the two younger children to leave, and raped her, both orally and vaginally.  R.E. said Wooten then left without making any repairs to the house.  Wilson returned shortly thereafter, but R.E. did not tell her what had happened.  R.E. explained that she did not tell anyone that she had been raped until November 2012 because Wooten had threatened to hurt anyone that she told.  R.E. said that, after the rape, she saw Wooten around the apartment complex four or five times a week, up until they moved in September 2011.

{¶4}   Wooten was indicted on two counts of rape in violation of R.C. 2907.02(A)(1)(b) and two counts of rape in violation of R.C. 2907.02(A)(2), all felonies of the first degree.  Each count contained an attendant sexually violent predator specification.  A jury found Wooten guilty on the four counts of rape, and the court found Wooten guilty of the specifications.  After merging the allied offenses, the court sentenced Wooten to life without the possibility of parole.  Wooten now appeals and raises three assignments of error for our review.

II

Assignment of Error Number One

THE GUILTY VERDICTS FOR RAPE ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. WOOTEN'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶5}   In his first assignment of error, Wooten argues that his convictions for rape are against the manifest weight of the evidence.  We disagree.

In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way

and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact[-]finder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). An appellate court should exercise the power to reverse a judgment as against the manifest weight of the evidence only in exceptional cases. *Otten* at 340.

{¶6} R.C. 2907.02(A)(1)(b) provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" is defined as any "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶7} R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of

what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A).

{¶8}   Wooten argues that his convictions for rape are against the manifest weight of the evidence because: (1) the chances of Wooten committing the assault within the short period of time that R.E.'s mother was gone are "remote"; (2) two employees of Fulton Homes testified that Wooten was not alone in the apartment to make repairs to the sink and ceiling; and (3) R.E. waited over a year to report the incident.

## R.E.

{¶9}   R.E. testified that, in 2011, she was 11 years old and lived in an apartment in Fulton Homes with her mother and her four siblings; R.E. is the second oldest.  R.E. said she would often watch her younger siblings while her mother took her older sister to school.  R.E. stated that the trip usually took her mother 14 or 15 minutes, unless she had to stop at the store. If her mother stopped at the store, R.E. estimated that she would be gone about 30 minutes.

{¶10} R.E. explained that one day her mother left to take her sister to school and told her to let Wooten in "to fix something in the house upstairs."  R.E. testified that about five minutes after her mother left, Wooten knocked on the door and she let him in.  She said Wooten walked upstairs and into the bathroom.  R.E. then went into her bedroom with her two younger siblings, who were three and four years old at the time.  The youngest, she explained, was still an infant and was in her mother's room.

{¶11} According to R.E., Wooten then entered R.E.'s bedroom and told her two siblings to get out.  When they left, he closed R.E.'s bedroom door and approached her as she was sitting on the edge of her bed.  R.E. testified that Wooten pulled his pants down and told her to "suck on his private part."  R.E. initially said no, but, ultimately, did as she was told because she thought

Wooten looked like he was going to hit her. R.E. said that while his penis was in her mouth, Wooten moved back and forth at least ten times. He then withdrew his penis, pushed her back onto her bed, removed her pants, and vaginally raped her with his penis. R.E. testified that she told Wooten that "it hurt." R.E. said Wooten eventually stopped, got up, put his pants back on, and told her not to tell anyone or they would get hurt. According to R.E., Wooten then left without repairing anything in the house. R.E. estimated that Wooten was in the house about 15 to 20 minutes.

{¶12} R.E. said her mother returned home about five minutes after Wooten left, but she did not tell her what happened. R.E. explained that she did not tell her mother because she was scared that he would hurt them. R.E. said that she saw Wooten four or five times a week after the rape, until they moved out of Fulton Homes in September 2011. R.E. testified that she finally told her mother about the rape on November 29, 2012, after her mother warned her of the dangers of communicating with strangers online.

**Ashley Wilson**

{¶13} Ashley Wilson, R.E.'s mother, testified that in November 2012 she was checking R.E.'s Facebook account and noticed friend requests from people out of state. Wilson warned R.E. not to communicate with strangers online because "that is how kids get hurt." According to Wilson, R.E. then began sobbing. After approximately 15 minutes of crying, R.E. told Wilson that Wooten had raped her when they lived at Fulton Homes. According to Wilson, R.E. was "hysterical" when she was telling her that she had been raped because she was scared that Wooten would hurt them. Wilson immediately called the police.

{¶14} Wilson explained that she lived with her five children at Fulton Homes from January 2011 to September 2011. During that time, her children's ages were approximately 13,

11, 4, 2, and a newborn born in April 2011.  Wilson said that R.E. is her second oldest child and would often watch the younger children when Wilson took her oldest child to school.  Wilson testified that she would usually tell her neighbor, Yolanda, that she was leaving so Yolanda could keep a watch on the house.  Wilson said that the trip to and from school took approximately 14 minutes, unless she had to make a stop.  On the days when she stopped at the store or for gas, she estimated that she would be gone for 30 minutes.

{¶15} Wilson testified that she knew Wooten because he was a maintenance man at Fulton Homes and had been in her apartment several times to perform maintenance.  Wilson said she also knew Wooten because he dated her neighbor, Yolanda.  According to Wilson, every time Wooten had come to her apartment to do repairs he had come alone because the repairs needed were "nothing major."

**Sara Griffith**

{¶16} Sara Griffith, a sexual assault nurse with the NORD Center, conducted an exam of R.E.  As part of her exam, Griffith testified that she interviewed R.E. and Wilson to get a medical history.  Griffith then conducted a full physical examination of R.E.  However, because the assault had happened at least a year prior, Griffith said that she was not looking for any visible injuries related to the assault.

{¶17} Griffith stated that during her examination she found "mounds and notches, which are abnormal growths * * *[,] an extension beyond the borders of the hymen."  Griffith explained that notches could be caused "by a lot of different things," including a medical condition, injury, or some kind of birth defect.  According to Griffith, a mound is usually caused by some kind of trauma, but it could be caused by a lot of things, including a long history of constipation, diarrhea, or masturbation.  Neither R.E. nor Wilson reported R.E. as having a history of these

issues during their interviews with Griffith. Griffith testified that she did not observe any injuries on R.E. which she could "definitively" say were caused by a sexual assault. However, according to Griffith, the abnormalities she observed could be consistent with penetration.

**Jerry Ledbetter**

{¶18} Jerry Ledbetter is the president of the board of trustees for Fulton Homes. As part of his duties, Ledbetter is in charge of operations, including maintenance of the units. Ledbetter testified that Fulton Homes employs two maintenance workers, Raymond Tate and Norman Huff. Additionally, it had hired Wooten as an outside contractor to perform repairs three days a week. Ledbetter testified that in 2011 Wooten was living at Fulton Homes and, while he might have also lived elsewhere, Ledbetter always contacted Wooten at Fulton Homes. According to Ledbetter, Wooten is an extremely knowledgeable repairman and supervised Tate and Huff because of his advanced skills.

{¶19} Ledbetter explained that in 2011 there were no official work orders and that the office would not have a record of any minor repairs done at that time. Ledbetter stated that the maintenance workers could work a job alone or together, depending on the extent of the repair job, and that any one of the three maintenance workers could have been in Wilson's apartment alone.

{¶20} Ledbetter testified that when the police asked him about a sink repair to Wilson's unit, he could only remember a repair to her kitchen ceiling. Ledbetter said that Wilson called to say that her kitchen ceiling "was down" and he figured that it was the result of a bathtub overflowing. According to Ledbetter, he sent Huff in to repair the ceiling, but Huff did not do a satisfactory job so he sent Wooten and Tate to do the repair. Ledbetter admitted that there were

several repairs made to Wilson's home during her tenancy, but that he could not remember what those repairs were.

**{¶21}** Ledbetter described Wilson was a "terrible tenant" and said that she left the house "trashed." According to Ledbetter, Wilson was evicted for nonpayment of rent and currently owed Fulton Homes about $1,800.

**Raymond Tate**

**{¶22}** Raymond Tate is a maintenance employee of Fulton Homes. Tate testified that he often worked with Wooten and never saw him do anything inappropriate while in a tenant's home. Tate remembered performing three repairs to Wilson's home: a repair of a leak in her roof, a repair to her kitchen ceiling, and a repair to her kitchen sink. According to Tate, Wooten and Tate worked together on all three repairs. Tate testified that he only knew of Huff going into Wilson's apartment alone to make repairs. He explained that Huff had attempted to repair her kitchen ceiling, but Wooten and Tate were later sent in to fix his repair job.

**{¶23}** Tate testified that he did not always work with Wooten or Huff. Tate sometimes worked alone, depending on the repair job. While Tate admitted that he did not always know where Wooten was during the day, he said that usually he knew the location of at least one of the other maintenance workers because they always discussed their jobs for that day. According to Tate, Wooten was living in Elyria, but would sometimes stay down the street from Wilson with his "lady friend."

**Conclusion**

**{¶24}** Wooten argues that his convictions are against the manifest weight of the evidence because he was never in Wilson's apartment without another maintenance person.

However, both Ledbetter and Tate admitted that the maintenance workers might perform a repair job alone. While Tate testified that he was not aware of Wooten ever being in Wilson's apartment alone, Ledbetter testified that it was possible.

{¶25} Wooten further argues that R.E. is not credible because she waited more than a year to report the rape and the window of opportunity for Wooten to commit the crime was too small. R.E. testified that she did not report the rape at the time because Wooten had threatened to hurt whomever she told and R.E. continued to see Wooten around the apartment complex four or five times a week. While the window of opportunity for Wooten to commit the crime was small, Wooten had the opportunity to observe Wilson's schedule. Several witnesses testified that Wooten was living in Fulton Homes at the time, possibly even dating Wilson's neighbor, Yolanda. Reviewing the entire record, we cannot conclude that the greater amount of credible evidence weighs against Wooten's convictions. *See Thompkins*, 78 Ohio St.3d at 387.

{¶26} Wooten's first assignment of error is overruled.

Assignment of Error Number Two

THE GUILTY VERDICT FOR THE SEXUALLY VIOLENT PREDATOR SPECIFICATION IS AGAINST THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF MR. WOOTEN'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

Assignment of Error Number Three

THE GUILTY VERDICT FOR THE SEXUALLY VIOLENT PREDATOR SPECIFICATION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. WOOTEN'S RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶27}** In his second and third assignments of error, Wooten argues that his sexually violent predator specification convictions are not supported by sufficient evidence and are against the manifest weight of the evidence. We disagree.

**{¶28}** "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *Thompkins*, 78 Ohio St.3d at 386, quoting *Black's* at 1433. "In essence, sufficiency is a test of adequacy." *Thompkins* at 386. When reviewing a conviction for sufficiency, evidence must be viewed in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The pertinent question is whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

**{¶29}** "Whether the evidence is legally sufficient to sustain a verdict is a question of law." *Thompkins* at 386, citing *State v. Robinson*, 162 Ohio St. 486 (1955). This Court, therefore, reviews questions of sufficiency de novo. *State v. Salupo*, 177 Ohio App.3d 354, 2008-Ohio-3721, ¶ 4 (9th Dist.).

**{¶30}** A conviction that is supported by sufficient evidence may still be found to be against the manifest weight of the evidence. *Thompkins*, 78 Ohio St.3d at 387. "Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's* at 1594.

**{¶31}** A sexually violent predator is "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). "Accordingly, R.C. 2971.01's plain language

unambiguously requires that the three following factors exist before a defendant may be labeled as a sexually violent predator: (1) that on or after January 1, 1997; (2) he commits a sexually violent offense; and (3) it is likely that he will engage in at least one more sexually violent offense in the future." *State v. Hardges*, 9th Dist. Summit No. 24175, 2008-Ohio-5567, ¶ 48. The statute lists "factors [that] *may* be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses." (Emphasis added.) *See* R.C. 2971.01(H)(2). Those factors include:

> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
>
> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
>
> (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
>
> (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
>
> (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
>
> (f) Any other relevant evidence.

R.C. 2971.01(H)(2)(a)-(f).

{¶32} Wooten argues that his sexually violent predator specification convictions are not supported by sufficient evidence because he does not meet the requirements of R.C. 2971.01(H)(2)(a) – having been convicted two or more times of a sexually oriented offense. Specifically, Wooten argues that his charge of rape in this case could not be considered a conviction under R.C. 2971.01(H)(2)(a).

{¶33} In support of his argument, Wooten cites to *State v. Smith*, 104 Ohio St.3d 106, 2004-Ohio-6238. In *Smith*, the Court interpreted the former sexually violent predator specification statute. At that time, R.C. 2971.01(H)(1) defined a "'sexually violent predator' as 'a person who has been convicted of or pleaded guilty to committing, on or after January 1, 1997, a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses.'" *Smith* at ¶ 1, quoting former R.C. 2971.01(H)(1). The Court concluded that "only a conviction that existed prior to the indictment of the underlying offense [could] be used to support the specification." *Id*. The Court reasoned that because the specification must be charged in the indictment, "the grand jury must consider whether the person under investigation is 'a person who *has been convicted of* or *pleaded guilty to* committing a sexually violent offense.'" (Emphasis sic.) *Id*. at ¶ 18, quoting former R.C. 2971.01(H)(1).

{¶34} In response to *Smith*, the General Assembly modified R.C. 2971.01(H)(1) to define a sexually violent predator as "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." Thus, the statute no longer requires the defendant to have a prior sexually violent offense; it is enough that he or she is currently charged with having committed one. *See State v. Ditzler*, 9th Dist. Lorain No. 13CA010342, 2013-Ohio-4969, ¶ 5-10.

{¶35} Wooten does not appear to dispute that he could have been indicted with a sexually violent predator specification based on his current charges of rape. Instead, he argues that the court could not use his current charges under R.C. 2971.01(H)(2)(a) as evidence of the likelihood that he will commit a future sexually violent offense. For the following reasons, we decline to extend the Court's logic in *Smith* to the R.C. 2971.01(H)(2) factors.

{¶36} R.C. 2971.01(H)(1) and (H)(2) are fundamentally different. Unlike, R.C. 2971.01(H)(1), R.C. 2971.01(H)(2) does not contain elements of the offense that must be proven beyond a reasonable doubt. Instead, R.C. 2971.01(H)(2) merely contains factors that "*may* be considered as evidence tending to indicate that there is a likelihood that the person will engage in" a sexually violent offense in the future. (Emphasis added.) R.C. 2971.01(H)(2). Evidence as to the likelihood of the defendant committing a future offense is not considered until after he or she has been found guilty of the underlying offense. *See* R.C. 2971.02. *See also State v. Harrod*, 1st Dist. Hamilton No. C-990018, 1999 WL 797980, *3 (R.C. 2971.02 "anticipates that the determination of the specification will take place in a proceeding after the defendant has been found guilty of the underlying offense.") Because the factors used to determine whether the defendant is likely to commit a future sexually violent offense only become applicable "[f]ollowing a verdict of guilty on the charge of the offense," *Smith* is not applicable here. *See* R.C. 2971.02. This determination, however, does not end our analysis.

{¶37} R.C. 2971.01(H)(2)(a) only applies if "[t]he person has been convicted two or more times, in separate criminal actions, of a sexually oriented or a child-victim oriented offense." A conviction generally requires a finding of guilt and a sentence. *See State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, ¶ 12. *See also* Crim.R. 32(C). However, under certain limited circumstances a guilty finding alone is sufficient to constitute a conviction. *See State ex rel. Watkins v. Fiorenzo*, 71 Ohio St.3d 259, 260 (1994) ("R.C. 2921.41(C)(1) specifies permanent disqualification from, *inter alia*, any public office in this state if the public official is either 'convicted of *or pleads guilty to*, theft in office.' * * * [Therefore,] the General Assembly placed 'convicted' on equal footing with a guilty plea.").

**{¶38}** In *State v. Monteleone*, 9th Dist. Lorain No. 10CA009751, 2010-Ohio-5064, this Court concluded that "to constitute a prior conviction under R.C. 4511.19(G)(1)(c), a prior determination of guilt is what is contemplated by the statute and not a judgment of conviction." *Id*. at ¶ 10. However, the statute at issue in *Monteleone* was applicable if the offender had previously "been convicted of or pleaded guilty to" previous violations. *Id*. at ¶ 8. R.C. 2971.01(H)(2)(a) does not contain similar language. R.C. 2971.01(H)(2)(a) states that the offender "has been convicted two or more times." R.C. 2971.01(H)(2)(a) does not allow for consideration of prior guilty pleas. Interpreting the plain language of the statute, we cannot conclude that the General Assembly intended a guilty finding alone to constitute a conviction under R.C. 2971.01(H)(2)(a).[1]

**{¶39}** While we conclude that R.C. 2971.01(H)(2)(a) does not apply in this case, that is only one factor to be considered when determining whether Wooten is "likely to engage in the future in one or more sexually violent offenses." *See* R.C. 2971.01(H)(2). "Critically, only one of the factors listed in R.C. 2971.01(H)(2)(a)-(f) had to be shown for the trial court to find that [Wooten] is a sexually violent predator." *State v. Cartwright*, 12th Dist. Preble No. CA2012-03-003, 2013-Ohio-2156, ¶ 27.

**{¶40}** Wooten waived his right to a jury trial on the sexually violent predator specifications. After the jury found him guilty of rape, the court set the issue of specifications for a hearing. At that hearing, the State called two witnesses. Pam Moran, the office manager for the Lorain County Clerk of Courts, Criminal Division, testified that Wooten had a prior

---

[1] We note that the Eighth District has held that a finding of guilt in the current case may be used in conjunction with a prior conviction to satisfy the R.C. 2971.01(H)(2)(a). *See State v. Brown*, 8th Dist. Cuyahoga No. 98540, 2013-Ohio-1982, ¶ 29; *State v. Harrison*, 8th Dist. Cuyahoga No. 86925, 2006-Ohio-4119, ¶ 14.

conviction for gross sexual imposition ("GSI"). According to Moran, Wooten was indicted for GSI in March 2011 and pleaded guilty to an amended indictment charge of GSI, in violation of R.C. 2907.05(A)(1), a felony of the fourth degree, in February 2012. Moran said Wooten was sentenced to three years of community control in August 2012.

{¶41} Detective Orlando Colon, of the Lorain County Police Department, testified that Wooten's GSI conviction stemmed from an accusation that Wooten, on two separate occasions, had fondled the vagina and breasts of his live-in girlfriend's nine-year-old daughter. According to Detective Colon, the victim and her mother lived in Fulton Homes. Wooten was indicted in March 2011. R.E. testified that she was raped by Wooten while living at Fulton Homes between April 2011 and September 2011.

{¶42} Viewing the evidence in a light most favorable to the State, there is sufficient evidence to support a finding that Wooten is likely to commit a sexually violent offense in the future. In March 2011, Wooten was indicted for fondling the nine-year-old daughter of his live-in girlfriend. Later in 2011, he raped R.E., who was eleven years old. Wooten escalated his action from fondling to oral and vaginal rape. Further, Wooten used his position as a maintenance man for Fulton Homes to gain access to R.E.'s home when her mother was not there. We conclude that there is sufficient evidence in the record to support Wooten's convictions on his sexually violent predator specifications. *See* R.C. 2971.01(H)(2)(f).

{¶43} Wooten did not present any evidence at the hearing on the specifications. Instead, he focused his argument on why R.C. 2971.01(H)(2)(a)-(e) did not apply. Because Wooten did not present any evidence to address the likelihood of him committing a similar offense in the future, there is nothing for us to weigh against the State's evidence. Reviewing the evidence in

the record, we cannot conclude that Wooten's sexually violent predator specification convictions are against the manifest weight of the evidence.

{¶44} Wooten's second and third assignments of error are overruled.

III

{¶45} Wooten's assignments of error are overruled.  The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

HENSAL, P. J.
MOORE, J.
CONCUR.


APPEARANCES:

PAUL A. GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and NATASHA RUIZ GUERRIERI, Assistant Prosecuting Attorney, for Appellee.